UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____

United States of America
    Plaintiff,

    v.                                                                Docket No. 1:24-cr-003

Alton Ryan,
    Defendant

_____

## **DEFENDANT'S SENTENCING MEMORANDUM**

This is a cap/floor C-plea. If accepted by the court, Alton Ryan will serve a sentence of not less than 84 months or more than 151 months in prison.

The government's recommendation of 151 months is premised on his career offender status, his possession of a firearm at the time of his arrest, and what the Government characterizes as an "escalating" pattern of criminal activity.

Mr. Ryan's recommendation accounts for his criminal record and the conduct in this case but argues that the "career offender" status overstates his record and stresses his life circumstances and rehabilitative efforts as factors warranting the imposition of a lesser sentence.

In addition, Mr. Ryan asks the court to rule that his federal detainment commenced after he served the penalty for his state court parole setback,

because the United States assumed jurisdiction over the most serious aspects of the state court criminal prosecution.

Accordingly, Mr. Ryan asks the court to impose a sentence of 84 months, concurrent to what sentence he receives in state court.

A.   **Mr. Ryan's Background**.

Alton Ryan has lived a life marked by lack of proper care and supervision when he was a child, physical abuse by a stepparent and while in a juvenile detention facility, significant and unremitting physical pain and severe limitations on his ability to work, and a crippling substance use disorder that involved ingesting copious quantities of fentanyl, methamphetamine, and crack cocaine over many years. None of these things excuse his criminal behavior. His drug dealing will lead him to serve at least 84 months in a federal penitentiary. Mr. Ryan offers this information as context.

Mr. Ryan's biological father was mostly absent because he was in and out of prison. His stepfather abused drugs and alcohol and would take Mr. Ryan on drug runs and to parties when he was very young. Mr. Ryan was allowed to play with a live cannon, and ride snowmobiles and motorcycles as fast he wanted. He tried alcohol for the first time at age seven, and marijuana at eight. To him, this was normal.

Also normal was the abuse visited on him by his stepfather, who was more than twice his weight. The beatings were so bad that Mr. Ryan ran away at age fourteen and turned to alcohol and drugs. By fifteen, he was drinking every day, smoking marijuana all the time, and had tried cocaine and LSD.

While Mr. Ryan was not yet using opiates, when he suffered a severely broken leg at age thirteen, the doctors gave him high doses of morphine and Percocet. His grades in school were poor, and by age sixteen, he was given the option to go home or to placement. Due to his home situation, where his stepfather continued to reside, he chose the latter. Mr. Ryan was abused while in state custody and is a plaintiff in a lawsuit against the State.

At age nineteen, Mr. Ryan obtained his GED. As an adult he worked jobs that involved physical labor, such as roofing, paving, and auto mechanics. He had two children when he was young and was able to stay sober for several years. After he and the mother of his children separated, Mr. Ryan started using drugs again for a period, but he met a woman when he was about twenty-seven years old, and he was with her for fifteen years. They lived in the Concord/Loudon area, and his life was reasonably uneventful.

By the time that relationship ended, Mr. Ryan was approaching forty-three, the age when he committed his first felony. He had blown out his knee at work. Doctors could not diagnose the issue, he could not work, and he had great difficulty walking. Someone gave him methamphetamine and told him it could help with his mobility. It did, but he got hooked on it. Without a job or money to buy drugs, Mr. Ryan turned to selling them. He was arrested, convicted, and incarcerated. When he was released, he had nowhere to live, no money, and a knee injury that turned out to be chronic and prevented him from working the only jobs he knew, which involved heavy physical labor. His criminal activity in the last several years is undeniable. So is his addiction and

his sense of hopelessness. Mr. Ryan stopped using methamphetamine because of its impact on his cardiovascular system. He switched to crack cocaine, and smoked it constantly, even as he was being arrested in New Hampton. The habit consumed up to $1000 a week. Money that Mr. Ryan obtained from this conspiracy went to his next purchase of crack cocaine. He was homeless, and he is penniless.

    **B.**     **Sentencing Guideline Calculations**.

        **1.**     **Presentence Investigation Report (PSR)**.

The Probation Department used the "ice" factor to calculate the weight of the methamphetamine sold to an informant.[1] PSR, at 9. It included all the drugs found in the car in which Mr. Ryan was arrested, to arrive at a base offense level of 30.[2] Probation added two points because there were guns[3] in the car in which Mr. Ryan was arrested, PSR, at 9-10, and another two points for obstruction of justice because he fled from the police in New Hampton before submitting to arrest. PSR, at 10. That raised the offense level to 34. Because Mr. Ryan is a career offender, and 34 is higher than 32 (the career offender base offense level), Probation used the higher number. PSR, at 10. Three points were deducted for acceptance of responsibility, which accounted for a total offense level of 31. PSR, at 10. As a career offender, Mr. Ryan's

---

[1] Below, Mr. Ryan will argue that the "ice" factor should not be applied.
[2] The Government relies on the 246.5 grams of crack cocaine that was found in the car.
[3] The only firearm included in the plea agreement is the Walther pistol that was found in the car.

criminal history category (CHC) would be VI. Based on a total offense level of 31 and a CHC of VI, the guideline range is 188-235 months.

### 2. Government.

Mr. Ryan anticipates that the Government's calculation will be like that in the PSR, but he does not expect the Government to recommend the use of the "ice" factor. With that modification, the base offense level is 26. The Government will add four points, which raises the offense level to 30. Because Mr. Ryan is a career offender, and 32 is higher than 30, it will use the higher number. After accounting for acceptance of responsibility, and applying the career offender CHC of VI, the total offense level is 29, and the guideline range is 151-188 months.

### 3. Defense.

The defense agrees with the Government's assessment of the base offense level. It does not dispute that there were firearms in the car operated by Mr. Ryan at the time of his arrest in proximity to drugs, and that he attempted to flee from the police. Mr. Ryan contends that his criminal history significantly overrepresents his conduct and likelihood of recidivism. If the court accepts this argument, he will fall into CHC V instead of VI, and the guideline range would be 140-175 months.

### C. Downward Departure: CHC Significantly Overrepresents Past Criminal Conduct and Likelihood of Recidivism.

Under USSG § 4B1.2, a defendant is a "career offender" if he has two prior felony convictions for crimes of violence or controlled substance offenses. Mr. Ryan has no convictions for crimes of violence. The PSR concluded he is a

career offender based on three controlled substance convictions, and calculates a criminal history score of 14, which would place him in CHC VI regardless of the career offender designation. PSR, at 19.

Mr. Ryan is a career offender because he has at least two qualifying controlled substance convictions. This court can depart downward from that classification if it finds his record "significantly overrepresents the seriousness of [his] past criminal conduct and the likelihood of recidivism." United States v. Beckham, 968 F.2d 47, 54 (D.C. Cir. 1992); USSG § 4A1.3(b)(3)(A). The court can do so if the case is an "unusual case,"[4] "substantial[ly] atypical[],"[5] or "outside the heartland"[6] of the career offender guideline. The result of a departure from the career offender designation is the application of CHC V instead of VI.

Mr. Ryan asks the court to make this finding for the following reasons. First, the criminal record reveals charges not separated by an intervening period of release and rearrest. In 2017, Mr. Ryan was arrested in 217-CR-524 on April 3, 2017. PSR, at 14. Bail was set at $10,000 cash and it was never posted. The PSR did not count the convictions in 217-CR-776 (PSR, at 17) because there was no intervening arrest, and the sentence, 5-15 years in prison, was imposed the same day as 217-CR-524 (PSR, at 14). However, it counted the Belknap County case, 2017-CR-164, though he was arrested the same day as for 217-CR-524, and bail was set at $20,000 cash and never

---

[4] United States v. Adkins, 937 F.2d 947, 952 (4th Cir. 1991).
[5] United States v. Norfleet, 922 F.2d 50, 54 (1st Cir. 1990).
[6] United States v. Caldwell, 219 F.3d 1186, 1192 (10th Cir. 2000).

posted.  The sentence on -164, while not imposed the same day, was ostensibly concurrent to the Merrimack County 5-15-year term.  Had these charges been formally consolidated for sentencing, the Belknap County case would not have counted.

The Probation Department also assigned two points to the Merrimack District Court case, 217-CR-629.  PSR, at 16-17.  The record indicates Mr. Ryan was arrested on April 25, 2017, when he was in continuous custody in lieu of unposted cash bail on other cases.  The twelve-month sentence, imposed a week after the Belknap County sentence, was ostensibly concurrent with all other sentences.  Moreover, it is logical to conclude that in sentencing Mr. Ryan to 5-15 years, the parties were aware of and considered the conduct in Belknap County and Merrimack District Court cases that occurred in the same time frame.  As a group, the cases represent an episode of criminal activity in a short space of time rather than separate episodes where the defendant was arrested, sentenced, and released before committing a new offense.  Even if it is technically correct to count them separately, they are, in practical terms, more congruent with sentences that were imposed at the same time.

Second, Mr. Ryan's case is "substantially atypical" because of his age.  The usual age-based argument is that the defendant was so young when he committed the prior offenses, or they occurred so long time ago, it would be unfair to afford them their accustomed weight in the career offender or criminal history calculus.  That is not the argument here.  Despite a lifetime of trauma,

physical pain, and drug addiction, Mr. Ryan had no serious criminal conviction until he was over forty-three years old. He was no longer able to perform the only type of work he was trained for; he could not walk or alleviate his pain without using drugs; and he sustained his addiction by selling drugs. The "heartland" career offender began committing serious crimes when he was young and did not cease. That does not describe Mr. Ryan.

Third, Mr. Ryan's age and rehabilitative potential make him less of a risk, after a period of incarceration and continuation of treatment in prison, to recidivate. If the court adopts a sentence in the range of the floor proposed by the defendant, Mr. Ryan will be in his late fifties when released. Studies have shown that at such an age, the offender's record overstates his potential to reoffend. See, e.g., United States Sentencing Commission, Older Offenders in the Federal System (July 26, 2022) (stating that the recidivism rate of offenders over fifty (21.3%) was less than half of that for offenders under fifty (53.4%)).

If granted, the career offender departure reduces Mr. Ryan's CHC to V. Under these circumstances, he submits that the departure is warranted.

        **D.**    **Downward Variance: The "Ice" Factor**.

The PSR drug weight calculation raises the issue of whether the court should characterize the methamphetamine as "ice," which raised the base offense level from 26 to 30.

In United States v. Bean, 371 F. Supp. 3d 46 (D. N.H. 2019), Judge McCafferty addressed the applicability of the factor under similar circumstances. The court, reviewing sentencing policy, empirical data, and

decisions by other courts, found no justification for increasing the defendant's level of culpability, and thus, his base offense level, due to the purity level of the drug.  Id. at 50-57.  Since Bean, other courts have agreed.  See, e.g., United States v. Celestin, No. 21-125, 2023 WL 2018003 *3 n. 47 ("[A]t least eleven district courts … have … applied the methamphetamine mixture Guideline to all methamphetamine violations….") (Citing Bean and courts from the districts of Tennessee, California, Alabama, Virginia, Colorado, Idaho, Minnesota, Michigan, Iowa, and New Mexico).[7]

As stated above, on information and belief, the Government advocates for the "ice" multiplier only when it has evidence that the offender played some role, in addition to trafficking, that contributed to the placement of "pure" methamphetamine into the marketplace.  The Government will present no such evidence with respect to Mr. Ryan.  Accordingly, the fact that the drug is alleged to have been "pure" does not warrant an increase to the base offense number.

### E.  Booker Variances: Age, Addiction, Criminal Record, Amenability to Rehabilitation, and Life Circumstances.

Under 18 U.S.C. § 3553(a), the court must impose a sentence that is "sufficient but not greater than necessary" to achieve the purpose of sentencing.  In so doing, the court must consider the sentencing factors in §

---

[7] Courts in Nebraska and Wisconsin are in accord.  United States v. Havel, No. 4:21-CR-3075, 2023 WL 1930686 *4 (D. Neb. February 10, 2023); United States v. Pease, 740 F. Supp. 3d 728, 735 (E.D. Wis. 2024).  Judges in Maine consider whether to apply the purity factor on a case-by-case basis.  United States v. Razo, No. 1:11-cr-00184-JAW-1, 2025 WL 101769 *7 (D. Me. April 4, 2025) (Woodcock, J.); United States v. Kaufman, No. 2:18-cr-00036-GZS, 2019 WL 3220571 *1 (D. Me. July 17, 2019) (Singal, J.).

3553(a), and the sentencing guidelines, but may also consider imposing a sentence that varies downward from the guidelines. <u>Gall v. United States</u>, 128 S.Ct. 586 (2007); <u>Booker v. United States</u>, 543 U.S. 220 (2005). "A sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale." <u>United States v. Martin</u>, 520 F.3d 87, 91 (1st Cir. 2008).

     For reasons largely stated above, Mr. Ryan asks this court to consider varying downward from a guideline sentence based on his age, addiction history, life circumstances, criminal record, and amenability to rehabilitation.

     Mr. Ryan has already cited his age and studies showing older offenders are less likely to reoffend. This is especially so here, because he will serve several years in prison before he is released. He has argued for a downward departure because his career offender status substantially overstates his criminal record. If the court does not depart downward for those reasons, Mr. Ryan asks this court to consider a variance for the same reasons.

     Also contributing to his lower likelihood to reoffend are his addiction history, his recent understanding of how his life circumstances caused him to abuse drugs, and his demonstrated amenability to rehabilitation. Mr. Ryan's life circumstances are recited in the PSR and in this memo. He had poor parenting, poor adult role models, was subjected to abuse at home and in juvenile detention and began using alcohol and drugs at an early age. While he

worked hard, and had long stretches of sobriety, the seeds were planted for addiction to consume him. This happened when he became physically disabled – which was when he committed his first felony, and then, a string of drug-related felonies.

Mr. Ryan had tried drug treatment, but he lacked sufficient insight into his issues, and he lacked shelter and other life necessities, which made meaningful participation impracticable. He was not offered a chance at the prison's Summit Program during his first incarceration. But during this incarceration, which commenced in March of 2023, Mr. Ryan has taken advantage of treatment opportunities, and he has made connections between his life history and addiction history that had never occurred to him.

While at the prison, Mr. Ryan completed the Summit Program. He hoped to be considered for the LASER Program, but the gun possession disqualified him. In federal custody, Mr. Ryan completed the Therapeutic Community Program in Strafford County. As part of that program, he wrote a hundred-page-long "life story" and worked in individual and group settings on connecting his childhood and adolescent history to his addiction. Having made those associations, he was better able to understand his triggers, and grasp what he needs to do to make meaningful changes. After completing Therapeutic Community, Mr. Ryan sought to be released to a community-based rehabilitation program. The court denied his request, but, undeterred, Mr. Ryan asked to be transferred to Merrimack County, to participate in its SOAR Program.

Despite a debilitating infection in his lower leg that kept him bedridden and interrupted his participation, Mr. Ryan graduated from SOAR in August. He hopes for a prison placement that permits him to take advantage of treatment and rehabilitation opportunities. His work over the last couple of years has been a positive harbinger for the future; one that entitles him to a measure of relief against a guidelines sentence. See United States v. Martin, 520 F.3d 87, 93–94 (1st Cir. 2008) ("[A] founded prospect of meaningful rehabilitation remains a permissible basis for a variant sentence under the now-advisory guidelines.").

F.     **Effective Date of Federal Detainment; USSG § 5G1.3.**

Mr. Ryan asks the court to rule that his federal custody commenced before he was formally transferred to federal custody and impose this sentence concurrently with any state court sentence to be imposed in Belknap County Docket Number 211-2023-CR-122.

As recited in the PSR, Mr. Ryan was, at the time of his arrest on March 2, 2023, on state parole. He had been under federal surveillance for several months before the arrest. Mr. Ryan received a six-month parole violation sanction. He was detained without bail on the state court charges thereafter, and he has been in continuous custody at a facility that provides a level of security on par with that of a federal prison or pretrial detention facility.

Under USSG § 5G1.3, Mr. Ryan seeks a ruling that his federal detainment began before May 10, 2024. The guideline requires a consecutive federal sentence if the defendant was on work release, furlough, or escape

status at the time of this offense, which he was not. USSG § 5G1.3(a). The state court criminal conduct is "relevant conduct" in this case. See USSG § 5G1.3(b) & (c). The Government assumed jurisdiction over the state court case to (a.) employ the cocaine seized in the drug quantity calculation in this case; (b.) use the weapon found to justify enhancing Mr. Ryan's federal sentence; and (c.) use Mr. Ryan's flight from the state authorities to justify enhancing Mr. Ryan's federal sentence. Finally, none of the time served between the end of the parole sanction[8] and the date of the formal transfer to federal custody will be credited to any state court sentence. The state court case has been held in abeyance pending this sentencing proceeding. After Mr. Ryan is federally sentenced, he will be sentenced in state court on relatively minor motor vehicle offenses stemming from the New Hampton pursuit and will not receive an additional stand committed sentence. If this substantial period of incarceration does not count toward the federal sentence, it will be "dead time" that will never be credited to any sentence.

For these reasons, the court should rule that Mr. Ryan's federal detainment commenced on September 2, 2023, which is when his six-month state court parole sanction ended. The sentence should be consecutive to the parole sanction, but concurrent with any sentence imposed on the Belknap County charges in State of New Hampshire v. Alton Ryan, 211-2023-CR-122.

---

[8] Mr. Ryan concedes he is not entitled to have this sentence run concurrently with his six-month parole sanction. USSG § 5G1.3, Application Note 4(C).

G. **Conclusion.**

A sentence of 84 months imposes significant punishment. It accounts for Mr. Ryan's conduct, his criminal history, and his inability to conform after his release on parole. This sentence also takes into consideration his life circumstances, age, and rehabilitative potential, as demonstrated during this most recent period of incarceration. When Mr. Ryan is released, he will be almost 60 years old. He will have wasted nearly 17 years of his life. Health permitting, he will have a chance to enjoy life as a free and sober person. The guidelines sentence and the sentence recommended by the Government do not afford him that chance.

Respectfully submitted,

ALTON RYAN

By his attorney,

ROTHSTEIN LAW LLC

By: /s/ David M. Rothstein
David M. Rothstein, N.H. #5991
100 High Street
Exeter, N.H. 03833
(603) 580-3980
rothsteindm@outlook.com

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of this motion on the Assistant United States Attorney this 11 day of September, 2025, via ECF.

/s/ David M. Rothstein
David M. Rothstein